**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF WASHINGTON**

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

## May 13, 2020

SEAN F. McAVOY, CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al*., | |
|       *Plaintiffs*, | Civil Action No. <u>2:20-cv-00175</u>-SAB |
| *ex rel.* [UNDER SEAL], | |
|       *Plaintiff-Relator*, | **COMPLAINT**<br>**(Jury Trial Demanded)** |
|     v. | |
| [UNDER SEAL], | |
|       *Defendants*. | |

## FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of ALASKA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, and WASHINGTON, the Commonwealths of MASSACHUSETTS and VIRGINIA, and the DISTRICT OF COLUMBIA, | **FILED UNDER SEAL**<br><br>Civil Action No. <u>2:20-cv-00175-</u>SAB<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |
| *Plaintiffs*, | |
| *ex rel.* MAXWELL OLLIVANT, | |
| *Plaintiff-Relator*, | |
| v. | |
| OPTUM, UNITEDHEALTH GROUP, INC. | |
| *Defendants*. | |

## I.    INTRODUCTION

1.    Defendant UnitedHealth Group, Inc. ("United") is a for-profit health insurer that provides Medicare Part C health care plans, also known as "Medicare Advantage," for those Medicare patients that choose such plans.[1] As explained below, Medicare Advantage plans cover certain benefits covered by Medicare Part A (hospitalization), Part B (medical insurance), and Part D (prescription drugs) and sometimes include non-Medicare-covered services like dental and vision coverage.  Medicare Part C uses a capitated rate model of reimbursement (as opposed to fee-for-service).

2.    Under this model, United is paid a pre-set "capitated" rate calculated on the basis of the services anticipated to be required for a patient's specific health care needs.  United does not receive any additional money if additional patient care services, including hospitalization, are required.  By law, however, a Medicare Part C plan is required to provide at least the same level of services as traditional Medicare coverage (hospitalizations, procedures, durable medical equipment, medications, etc.). *See* 42 C.F.R. § 422.100(c)(1); *see also* 42 C.F.R. § 422.101.

3.    Defendant Optum is a subsidiary of United (together with United, "Optum/United").  Among other things, it employs medical providers such as nurse practitioners and physician assistants who are sent to different facilities to care for patients insured by United.

---

[1] United also provides similar coverage to Medicaid patients and Medicare-Medicaid dual-eligible patients under managed care plans (the "Medicaid plans").  Although we focus on Medicare Advantage in this Complaint, these Medicaid plans are equally implicated in this action.  *See, e.g.*, 81 FR 27497 (HHS May 6, 2016) (final rule on Medicaid managed care requirements and improvements).

4.      Plaintiff-Relator Dr. Maxwell Ollivant, DNP, ARNP, FNP-C[2] ("Relator" or "Dr. Ollivant") is a nurse practitioner ("NP")[3] working for Optum. Relator asserts that in order to increase profits Optum/United withheld or unduly delayed necessary services such as hospitalization so as not to incur added expenses.  Optum/United tout lowering ***unnecessary*** hospitalizations as their business model.  *See, e.g.*, https://www.optum.com/solutions/population-health/clinical-management/long-term-care/isnp-care-model.html.  But they also seek to decrease ***necessary*** hospitalizations.  Optum/United's practice of not sending members who present with life-threatening conditions to the hospital constitute a material failure to render essential and anticipated services paid for by the capitated rate. The failure to provide essential services also wholly vitiates the worth of the services Optum/United render in exchange for government payments. Because Optum/United are not providing all essential services, their claims for Medicare payments constitute false claims under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and state false claims and fraud statutes.

## II.      JURISDICTION AND VENUE

5.      Relator brings this action on behalf of himself and the United States, for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the states of Alaska, for violations of the Alaska Medical Assistance False Claim and Reporting Act, AK Stat. § 09.58 *et seq*., California, for violations of the California False Claims Act, Cal. Gov't Code § 12650 *et seq*., Colorado, for violations of the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*., Connecticut, for violations of the Connecticut False Claims Act,

---

[2] Dr. Ollivant has a doctorate in nursing practice, which involves two additional years of schooling beyond a nurse practitioner degree.

[3] A glossary of terms and acronyms appears in Section VI.

C.G.S. § 4-274 *et seq*., Delaware, for violations of the Delaware False Claims and Reporting Act,

6 Del. C. § 1201 *et seq*., Florida, for violations of the Florida False Claims Act, Fla. Stat. Ann. §

68.081 *et seq*., Georgia, for violations of the Georgia False Medicaid Claims Act, Ga. Code Ann.

§ 49-4-168 *et seq*., Hawaii, for violations of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-

21 *et seq*., Illinois, for violations of the Illinois False Claims Act, 740 ILCS 175/1 *et seq*.,

Indiana, for violations of the Indiana False Claims and Whistleblower Protection Act, Burns Ind.

Code Ann. § 5-11-5.5-1 *et seq*., Iowa, for violations of the Iowa False Claims Act, Iowa Code

685.1 *et seq*., Louisiana, for violations of the Louisiana Medical Assistance Programs Integrity

Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*., Maryland, for violations of the Maryland False

Health Claims Act, Md. Health Code Ann. § 2-601 *et seq*., Michigan, for violations of the

Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*., Minnesota, for

violations of the Minnesota Fraudulent State Claims Act, Minn. Stat. § 15C.01 *et seq*. , Montana,

for violations of the Montana False Claims Act; Mont. Code Ann. § 17-8-401 *et seq*., Nevada,

for violations of the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*., New

Jersey, for violations of the New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*., New

Mexico, for violations of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-

1 *et seq*., New York, for violations of the New York False Claims Act, N.Y. State Fin. Law §

187 *et seq*., North Carolina, for violations of the North Carolina False Claims Act, 52 N.C.G.S. §

1-605 *et seq*., Oklahoma, for violations of the Oklahoma Medicaid False Claims Act, 63 Okl. St.

§ 5053 *et seq*., Rhode Island, for violations of the Rhode Island State False Claims Act 1956; R.I.

Gen. Laws § 9-1.1-1 *et seq*., Tennessee, for violations of the Tennessee Medicaid False Claims

Act, Tenn. Code Ann. § 71-5-181 *et seq*., Texas, for violations of the Texas Medicaid Fraud

Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*., Vermont for violations of the

Vermont False Claims Act, 32 V.S.A. § 632 *et seq*., and Washington, for violations of the

Washington Medicaid Fraud False Claims Act, Rev. Code Wash.  § 74.66 *et seq*., the

Commonwealths of Massachusetts, the Commonwealth of Massachusetts, for violations of the

Massachusetts False Claims Law, Mass. Ann. Laws ch. 12, § 5A-5O *et seq*., and Virginia, for

violations of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*., and

the District of Columbia, for violations of the District of Columbia False Claims Act, D.C. Code

§ 2-381.01 *et seq*. (the "State Claims"), and, pursuant to 26 U.S.C. § 62(a)(20), seeks damages in

connection with violations of 31 U.S.C. §§ 3729-3733 and the State Claims.

6.      Relator has provided a copy of the complaint, a written disclosure, and material

information to the United States and each of the State Plaintiffs prior to the filing of this

Complaint.

7.      This Court has federal subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the State Claims

pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

8.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a) because Defendants can be found in and transact business in this District.  In addition,

many acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

9.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729

occurred in this District.

10.     Relator's claims and this Complaint are not based upon prior public disclosures of

allegations or transactions in a federal criminal, civil, or administrative hearing in which the

Government is already a party, or in a congressional, Government Accountability Office, or

4

other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).   Nor are these claims based on any public allegations or complaints in which any of the State Plaintiffs are a party.

11.    To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B).  The Relator has direct and independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to all of the Plaintiffs before filing this *qui tam* action based on that information.  *Id*.  In addition, the Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and has voluntarily provided the information to all of the Plaintiffs before filing an action under this section.

### III.    PARTIES

#### A. PLAINTIFFS

12.    Relator **Maxwell Ollivant**, a resident of Washington State, has worked in the medical field for the last ten years, primarily focusing on long-term care, post-acute care, urgent care, and family practice.  Dr. Ollivant received his Bachelor of Science in Nursing in 2012 from Washington State University College of Nursing in Spokane, Washington.  He obtained a Doctor of Nursing Practice with Family Nurse Practitioner Specialty from Washington State University College of Nursing in Vancouver, Washington in 2016.  Dr. Ollivant has worked for several large organizations in addition to Optum, including Kaiser Permanente and, currently, TeamHealth.  He has also been a Clinical Nursing Instructor and nursing tutor.

13.    Plaintiffs the United States of America (the "United States"), the States of Alaska, California, Colorado, Connecticut Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New

York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia (collectively, the "State Plaintiffs," and collectively with the United States, the "Plaintiffs"), are the real parties in interest to this action.

### B. DEFENDANTS

14.     Defendant **Optum** is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  It is a pharmacy benefit manager and care services group operating across 150 countries in North America, South America, Europe, Asia Pacific and the Middle East.  As of 2019, Optum's revenues have surpassed $100 billion.

15.     Optum is a wholly owned subsidiary of Defendant **UnitedHealth Group Inc**., also a Delaware corporation with its principal place of business in Minnetonka, Minnesota.  It is a for-profit managed health care company that offers health care products and insurance services. It is the largest healthcare company in the world by revenue, with 2019 revenue of $242.2 billion. United has two primary subsidiaries: UnitedHealthCare, Inc., which provides health benefits, and Optum, which provides health services.  Optum/United is an industry leader and is very profitable.  *See, e.g.*, https://www.healthcarefinancenews.com/news/secret-weapon-unitedhealths-optum-business-laying-waste-old-notions-about-how-payers-make-money. In 2017, Optum accounted for 44 percent of United's profits.

## IV.     FACTS

16.     Relator worked as a NP for a division of Optum called Complex Care Management, which is a service group that provides medical staff, including nurse practitioners and physician assistants, to skilled nursing facilities ("SNF"), among other health care organizations.  The staff provide care to patients who sign up for United's Medicare Part C

"institutional special needs plan" ("ISNP," *i.e.*, a nursing home plan). *See* 42 U.S.C.A. § 1395w-28(b)(6). This plan is specifically for "individuals with severe or disabling chronic conditions who . . . have one or more comorbid and medically complex chronic conditions that are substantially disabling or life threatening, have a high risk of hospitalization or other significant adverse health outcomes, and require specialized delivery systems across domains of care." *Id.* at § 1395w-28(b)(6)(B)(iii). Optum cares for more than 70,000 ISNP patients across the country. *See* https://www.optum.com/solutions/population-health/clinical-management/long-term-care/isnp-care-model.html.

17.    Dr. Ollivant practiced at three SNFs with patients covered by United's ISNP. The three facilities were:

> Linden Grove Health Care Center
> 400 29th St NE
> Puyallup, WA 98372
>
> Puyallup Nursing and Rehabilitation Center
> 516 SE 23rd Ave SE
> Puyallup, WA 98372
>
> Life Care Center of Puyallup
> 511 10th Ave SE,
> Puyallup, WA 98372

18.    Optum/United operate other SNFs throughout the State of Washington, including Life Care Center of Kirkland, WA, and across the country. According to Dr. Ollivant, United calls the shots when it comes to the services Optum does or does not provide.

19.    The gravamen of Dr. Ollivant's complaint is that Optum/United billed the Government for services that fell below the standard of care required for all patients in ways that jeopardized the health and well-being of patients (also called "members" of the plan). For example, Optum would flat out refuse or unduly delay transfers of patients with acute, life-

threatening medical conditions to hospitals in order to (1) continue to receive the Medicare capitated payments United received for those patients and (2) avoid incurring the added expense of the resulting hospital bills, which would decrease the amount of net revenue they could accumulate. By refusing to provide care necessary to sustain their patients' lives, Optum/United rendered their services essentially worthless and/or engaged in services that were below the standards of care required by Medicare and Medicaid. Billing these Government health insurance programs for worthless and/or deficient services constitutes the making of false claims in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. If the Government had known the true facts surrounding the services delivered (or not delivered) by Optum/United, the Government would have refused to pay the claims submitted by Optum/United.

20.     Dr. Ollivant reported his concerns and turned documents over to the Washington State Attorney General's Office ("AG") and the State Department of Health, who are investigating Relator's claims. Representatives of the AG interviewed Dr. Ollivant on March 12, 2020 and on April 6, 2020, and informed him that they planned to report his allegations to the Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") in Seattle for investigation.  On April 24, 2020, Dr. Ollivant received a letter advising him that Qlarant, an Investigations Medicare Integrity Contractor (I-MEDIC), is investigating his claims as well.  Qlarant's Case ID is 108051.

### A. PATIENT MT

21.     Dr. Ollivant became concerned that Optum's aggressive avoidance of hospitalizations was threatening the lives of its patients in September 2019. He had an elderly patient, MT, at Life Care Center of Puyallup, Washington, who had several comorbidities including chronic kidney disease, chronic heart failure, atrial fibrillation, and cirrhosis.  MT was

a "full code" patient, meaning he wanted to be treated if he became ill.  In late September 2019, MT was experiencing new onset stroke symptoms of neurological deficits which included slurring of speech and facial droop before the start of Dr. Ollivant's shift. The facility's nursing staff (unaffiliated with Optum) called the Optum Provider Call Center,[4] believed to be located in Colorado, where an Optum nurse practitioner instructed the nurse then attending MT that the symptoms were consistent with Bell's Palsy.  Bell's Palsy, however, is a diagnosis of exclusion, meaning that all other acute possibilities must be considered and rejected before applying the Bell's Palsy diagnosis. A computed tomography (CT) scan is required to distinguish between a stroke and Bell's Palsy. To conduct a CT scan on MT, he would have to be transferred to the hospital. The Optum nurse practitioner failed to direct that MT be transferred to an emergency room (ER) immediately.

22.     The facility nurse grew concerned about the directive from the Optum nurse practitioner and phoned an unaffiliated primary care physician named Dr. Dennis Kim, who ordered an immediate hospital transfer. Once at the hospital MT was found to be having a stroke. Following his discharge from the hospital, MT has exhibited permanent neurological deficits, including slurring and facial droop, that were exacerbated by the delay in care, which, according to Paul LNU, the executive director of the SNF, was approximately one hour.  Notably, there is considered to be a "Golden Hour" in which to treat a patient from the onset of a stroke to have

---

[4] As discussed below, Optum goes to great lengths to have such inquiries directed to its providers and call centers before contacting any other providers, physicians, hospitals, or emergency medical services.  Optum pays dividends to SNFs to be the first contacted and also pays other providers to get "first dibs."  Further, it trains its staff to take several actions to avoid "bypasses," the term used when an SNF or its staff contacts someone other than Optum in the first instance when a patient suffers a change in condition.  Optum's obvious goal in these endeavors is to prevent transfers to the hospital or other expensive medical services when possible.

the most favorable outcome.  That Golden Hour was squandered with MT by the Optum Provider Call Center.

23.    Upon starting his shift, Dr. Ollivant sent an email to the Clinical Services Manager Fang Fang, Relator's supervisor and also a NP,[5] stating that this was "a big miss" and detailing the appropriate work up for Bell's Palsy.  He pointed out that a CT scan would be necessary before reaching the conclusion that it was Bell's Palsy. His manager stated she would reach out to the Provider Call Center Manager regarding the case. This was the last he heard about it from Fang.  On January 30, 2020, he informed Angela Jackson, the UnitedHealth Group emergency HR representative, about this incident as well.

24.    MT had a second episode where Optum/United placed his health at risk by resisting or delaying his transfer to a hospital.  On January 29, 2020, Optum/United registered nurse (RN) Hyunae Schnackenberg (who goes by the short-hand name "Hanna") reported that MT was vomiting what she described over the phone as appearing like "fecal material" and his stool was an abnormal color. Dr. Ollivant suspected a GI bleed. He reported the situation to Fang.  Dr. Ollivant urged that the patient be transferred, as it would require several hours to receive the CBC blood test result showing whether and how much the patient was bleeding. Fang stated that she did not think the patient needed to go to the hospital.  In an email, Fang suggested that if MT's Guaiac stool test, a common bedside test, became positive for blood and GI bleeding was suspected that they hold MT's blood thinner, Apixaban, for a few days and add Carafate or increase his acid reduction therapy and provide fluids.  Dr. Ollivant told Fang that he disagreed with her suggestion based on his clinical understanding and evidence-based standards.

---

[5] Relator also believes he cc'd the then-Interim Director of Clinical Operations Darlene Flaig, another NP based in the Optum corporate headquarters in Minnesota.

He asked her to provide him "with the evidence research for [her] suggestion."  In a subsequent phone call, Fang again resisted transporting MT and said she would contact the Optum Regional Medical Director Dr. Kevin Henning for a second opinion.  When MT's Guaiac test turned positive for bleeding. Dr. Ollivant had MT transported immediately so as to avoid further delay. Dr. Ollivant forwarded the email exchanges to Steve Thireos, the Director of Medical Clinical Operations and Fang's supervisor. (*Id.*)  Relator never heard back from Thireos about the matter. A few minutes later, however, Fang approved the transfer by text.  MT was admitted to the hospital in acute distress with a diagnosis of gastrointestinal bleed. He was given nasogastric decompression, a treatment unavailable at the SNF, and was treated for a small bowel obstruction.

25.    Several hours after MT was sent to the ER, Fang responded with a purported evidence-based approach similar to her earlier suggestion, but did not cite to any actual research. She included Dr. Henning and another nurse practitioner on the team, Andrew Grossman, on the email.  Fang's suggestion was wrong, however.  A positive stool Guaiac test in MT's situation is presumptively a GI bleed and requires a visit to the ER right away at a minimum, and perhaps an emergency endoscopy.  While it might be acceptable to wait with an otherwise healthy patient with no symptoms, MT had multiple risk factors for a for a GI bleed, including that he was taking two blood thinners for his heart conditions and had cirrhosis, both of which increase the risk of bleeding.  Further, he almost certainly, given his age, had diverticulosis, which can also cause bleeding.  Moreover, MT was already anemic, meaning he might need a transfusion and/or emergency endoscopy to stop the bleeding.  Finally, he could have had an infection causing gastroenteritis which could complicate things and possibly cause sepsis and shock if not treated

quickly. In short, to not send MT to the ER under these circumstances would probably have been malpractice and certainly fell below the standard of care.

26.     Following this episode, Dr. Ollivant initiated a "One Breath" emergency concern with the United human resources department.  He sent the above emails and text exchanges to Angela Jackson, an Employee Relations Case Manager. At a meeting two days later with Thireos and others, Dr. Ollivant was criticized for his communication style. Thireos also disputed that MT had been admitted to the hospital with a diagnosis of GI bleed, even though MT's admission record states otherwise.

27.     Two weeks later, Thireos told Relator that he believed MT could have been taken care of on site and did not need hospitalization. He placed Relator on a "Development Plan" that was approved by Optum's HR department.  The plan highlighted that Relator needed to develop "[u]nderstanding [of] Optum clinical Model of Care and procedure." The primary issue was Dr. Ollivant's adherence to Optum's stated protocol in addressing a patient's "change in condition" ("CIC").  According to Optum's ISNP Clinical Manual (2019) (the "ISNP Playbook"), the following steps, among others, are required:

1.  The "Advanced Practice Clinician" or "APC" -- *i.e.*, a nurse practitioner like Relator or physician's assistant, receives a call that a patient has had a CIC;

2.  The APC provides immediate diagnostic testing, orders, and/or treatment if needed;

3.  The APC assesses the patient within 24 hours of the CIC and makes a differential diagnosis;

4.  The APC calls the Optum Clinical Service Manager ("CSM," *i.e.*, Fang)/Optum Clinical Advisor ("CA")/Optum Regional Medical Director ("MD") to discuss diagnosis and treatment plan in the SNF/ALF/home vs hospital;

5.  The APC notifies and collaborates with the SNF's primary care physician ("PCP"), paid by Optum;

6. The APC discusses assessment and treatment plan with the patient or person responsible for the patient ("RP");

7. The APC works with the PCP, SNF staff, and RP to determine where member will be treated;

8. The APC writes orders for care and determines if ISD/SNF benefit is appropriate.

28. This protocol can take anywhere from an hour (if all parties timely respond) to more than a day to complete. Nowhere does the protocol provide for medical emergencies, which are to be expected in this particular population.

### B. PATIENT SK

29. Another of Dr. Ollivant's patients, SK, also at Life Care Center of Puyallup, had late-stage chronic kidney disease and congestive heart failure. His anemia was worsening and his hemoglobin dropped to around 5.4. With such a low hemoglobin, the patient was at risk for high-dynamic congestive heart failure. Dr. Ollivant contacted his manager, Fang, to ask if he should send the patient to the hospital for a blood transfusion. Fang instructed him to simply give SK another dose of Procrit, a drug which helps a person generate new red blood cells. She did not suggest a workup for the anemia or any additional testing.

30. Dr. Ollivant felt uncomfortable with that suggestion, so he contacted the patient's nephrologist, who stated that Procrit would not work fast enough and that the patient needed to go to the ER for a transfusion and to determine if there was an alternative cause, such as internal bleeding, for the drop in hemoglobin. Dr. Ollivant then transferred the patient to the ER where SK received a blood transfusion and was found to have a GI bleed, which was cauterized. Of note, SK was listed as Do Not Rescuscitate ("DNR") with comfort care in his medical records, which does not require transfers to the hospital. Fang subsequently expressed unhappiness with Dr. Ollivant's decision to hospitalize SK.

13

## C. PATIENT LG

31.    On February 5, 2020, Patient LG at Puyallup Nursing and Rehabilitation Center developed sudden onset hemoptysis (bloody cough) from his trachea site. Dr. Ollivant was able to examine the patient within 15 minutes of being notified of the change in condition. LG was positive for copious hemoptysis. He was suffering from shortness of breath and was hypoxic.  In listening to his lungs, LG had rhonchi throughout, indicating congestion and likely aspiration of blood. His son, who was the power of attorney ("POA"), asked that he be sent to the hospital. Dr. Ollivant immediately sent LG to the hospital, which admitted him to its ICU with a diagnosis of hemoptysis. Relator then notified Fang and other Optum personnel that he had transferred LG. Fang contacted Dr. Ollivant by phone and then followed with an email stating that  prior to hospitalizing any patient, he contact her and follow all of the steps set forth in the ISNP playbook and outlined above.  Fang explained that following this procedure was "an expectation across the country [that is, throughout the United States]."

### D. IMPROPER INCENTIVES AND CONDUCT

32.    Optum/United incentivizes its staff to withhold necessary hospitalizations in other ways. For example, they tie part of a nurse practitioner's compensation to low hospitalization rates, referred to as "Utilization." Ways to lower Utilization are set forth in a chart in a pamphlet setting forth Optum's Quarterly Variable Compensation.  (*Id*.).  Dr. Ollivant, for example, had been working for Optum/United for approximately one year. His compensation for three out of four of those quarters was reduced by at least $1,000 because he was deemed to have hospitalized too many patients.

33.    Optum/United also rewards SNFs for withholding care in the form of a dividend that increases when hospitalizations go down and is reduced when the number of hospitalizations

14

goes up.  These payments to the facility are part of Optum/United's "Premium Dividend

Program (PDP)."

34.    Puyallup Nursing and Rehabilitation Center, for example, had 324 hospital

admissions per 1,000 patients during the second quarter of calendar year 2019.    Optum/United

paid the facility a PDP of $1,850.  In the third quarter, this nursing facility had zero

hospitalizations per thousand patients. Optum/United paid it a PDP of $6,160, the maximum

PDP realizable under the program. This dividend clearly incentivizes the facility to **not**

hospitalize patients even when their conditions are serious and life-threatening, thereby

effectively rendering worthless the medical services paid for by Medicare and Medicaid.

35.    SNFs are also compensated for notifying Optum before a patient is transferred to

the hospital.  Failure to do so is called "Untimely Optum Notification" or "Bypass."  Indeed,

Optum took several steps to prevent bypasses from occurring.  In a February 3, 2020 email, Fang

advised her team of providers, including Relator, on how to avoid bypasses, including several

proactive steps each provider should take with the staff and management of the SNFs.

36.    Similarly, the ISPN Playbook sets forth the "Transfer Alternative Program,"

which is a "standardized process of collecting, assessing and reviewing information surrounding

a transfer" of a patient.  The stated "aim" of the program is to "improve quality of care, improve

medical management, identify areas of opportunity and ***reduce overall costs by avoiding

unnecessary hospitalizations***." (emphasis added).

37.    In addition, according to Dr. Ollivant, Optum/United pays other area provider

groups to give Optum/United "first dibs" on providing care to those group's patients. For

example they pay Swenson Healthcare and TeamHealth a monetary amount so that nursing staff

at the skilled nursing facility will be required to call Optum/United for patient orders rather than

calling their usual primary care physician. This is designed to help Optum/United prevent patients from being sent to the hospital.

### E. PUSH FOR "DO NOT RESUSCITATE" DIRECTIVES

38.    Optum/United engages in another practice designed to reduce costs and increase profits. They require providers like Relator to pressure nursing home residents to switch from full code to DNR status or palliative/comfort care (called "DNR Comfort"), meaning that instead of the SNF implementing a full panoply of life-saving measures, a patient would not be resuscitated or intubated if he or she stopped breathing and would receive limited care such as not being sent to the hospital for acute illnesses. If a patient chose DNR (limited or comfort), that choice was placed on the Washington state POLST form (physician order for life sustaining treatment) that was then placed in their facility chart. It would also be documented in Optum's charting program (called "pathway") under the "advanced care plan" section.

39.    On February 5, 2020, Wanda Bryant, a NP and a regional Director of Medical and Clinical Operations, stated on an all-staff phone meeting that the Optum Program is "on mission" when starting a new building to try and get patients to a DNR status from their full code status. There were approximately 50 other people besides Dr. Ollivant on that phone call.

40.    On February 11, 2020, Dr. Casey Fowler, a NP with a Ph.D. and an Optum Director of Clinical Operations, sent an email to the Washington State Clinical Service Managers, Bryant, Dr. Henning, and Thireos, as interim Director of Medical and Clinical Operations for Washington. Relator's supervisor Fang forwarded the email to her team.  The cover email from Fang asked that the team review the attached report to "target" patients who were full code and/or high risk for hospitalization according to Optum's "Mortality Risk Assessment" tool, as well as some buildings that had higher percentages of full-code patients

than others.  The email from Fowler stated that some high-risk patients still had "aggressive goals of care" and that these individuals would "benefit" from a serious illness conversation ("SIC"), which was a conversation to consider changing a patient's status to a palliative care approach and/or DNR, rather than full code and subject to hospitalizations. Optum even provided printouts of "Patient-tested language" and "Suggested surrogate language" to be used during SICs.  Optum's providers were instructed that, in those conversations, they were to inform the patient that, even if they were feeling well, they might only have days, weeks, or months to live. The providers were directed to see if the patients were willing to change their code status to DNR, DNR Comfort, and do not hospitalize.

41.    Fowler's email stated that "[t]he goal is not DNR but to help members to understand prognosis and disease trajectory. . . .  DNR is often the outcome, but it should not be a goal."  He nevertheless advised Optum's providers to have a SIC with patients three times to get them to "fully understand" their disease trajectory and prognosis, and that a single conversation was "not sufficient."  His email contained a list of patients with whom the providers were to have the SICs. Dr. Ollivant's patient MT was on this list despite the fact that Dr. Ollivant had informed his management multiple times that MT desired to remain full code and full treatment including hospital transfers. Relator's personal experience with Fang corroborates that the clear purpose of this email and the list of targeted patients was to have the providers "push" members during SICs to switch from full code to DNR.

42.    Dr. Ollivant believes that this policy and practice was part of an effort by Optum to convince as many patients as possible to adopt palliative care and/or DNR status so as to further reduce United's outlays for hospitalization and other medical care. The policy was not instituted out of authentic concern to respect patients' wishes. Indeed, it was completely one-

17

sided: Optum never instructed providers to go back to patients once they had elected DNR to check on whether they still wanted to be DNR or wanted to switch/return to full code or resume a code for hospitalization.

### F.    ACTIONS IN RESPONSE TO COVID-19

43.    On or about March 3, 2020, Optum/United pulled all of its providers out of the various SNFs to which it was delivering services in Bellingham, Snohamish and King Counties, Washington, due to the COVID-19 crisis. An email on March 3, 2020 from Kristy Duffey, Optum's Chief Clinical Officer, stated that they would render telephonic visits only "[f]or UnitedHealthcare members we serve in [those SNFs]."

44.    Notably, upon opening the Life Care Center of Puyallup, Linda Colson, then the Director of Clinical Operations stated that in order to be in compliance with the capitated model of care, Optum providers were required by Medicare to be physically present in each building at least three days a week. This did not occur during the week of March 2, 2020, or subsequently in March.  Several of the providers on Dr. Ollivant's team expressed concerns about ordering the right treatments if they were not able to physically examine the patients.

45.    On March 10, 2020, Fowler sent an email to the OptumCare WA NPs and OR OptumCare Clinical stating as follows:

> I am the manager on duty this week, and I am looking for volunteers [i.e., providers] who are interested in acute visits. Due to the current COVID-19 outbreak, *we will not be sending anyone to complete acute visits for members with respiratory conditions with unclear etiology*.

46.    A similar email was sent to the OptumCare WA NPs and OR OptumCare Clinical by Pritha Thomas, a NP and Optum Clinical Advisor, on March 16, 2020. Another email, dated March 13, 2020, from Fowler advises Oregon and Washington providers and staff to not send any written communications concerning Optum's plans for addressing the COVID-19 outbreak –

18

"we do not have any customer facing documents to share."  Instead, providers and staff were told to "only communicate our management plans through verbal communication."

47.     An undated Optum PowerPoint slide identifies the approaches to be taken by Optum providers.  One approach is to "[s]creen[] and avoid[] buildings suspicious of COVID-19" and another was to take a "[c]autious approach to seeing members suspicious for COVID-19."

48.     One of the facilities impacted by Optum/United's policies to pull its providers out of SNFs and to deny acute visits to patients with possible coronavirus infections was Life Care Center of Kirkland where 37 persons died from coronavirus according to press reports. On information and belief, Optum/United's policies directly contributed to this high death toll.

49.     Dr. Ollivant notified the Washington State Department of Health and Attorney General's office about these improper actions by Optum/United on March 12, 2020. According to media reports, on March 16, 2020, CMS and Washington State authorities conducted an inspection of Life Care Center of Kirkland leading to the imposition of a $611,000 fine.

> [F]ederal regulators said the most serious problems concerned a failure to rapidly identify and manage sick residents during an outbreak of respiratory illness that began by mid-February; a failure to notify the Washington Department of Health about the increasing rate of respiratory infections among residents; and a failure to have a backup plan in the absence of Life Care's primary clinician, who fell ill.[6]

50.     Dr. Ollivant's disclosures led to, or substantially contributed to, the decision to inspect Life Care Center of Kirkland and the imposition of the aforementioned $611,000 fine.

---

[6] "Feds propose $611,000 fine at Seattle-area nursing home," Associated Press, published online by Fox26News (Apr. 2, 2020), see https://kmph.com/news/coronavirus/feds-propose-611000-fine-at-seattle-area-nursing-home.

### G. DISCIPLINARY ACTIONS AND EXCESSIVE WORKLOAD

51.     On January 31, 2020, Dr. Ollivant's managers placed him on a performance improvement plan on the grounds that they did not like his communication style. This occurred only several days after Dr. Ollivant reported some of the above patient safety concerns to the corporate HR emergency line. The corrective action placed against Dr. Ollivant was approved by the same HR group.  Optum also increased his patient load to 82 patients and then 90. Dr. Ollivant resigned on February 21, 2020, effective March 20, 2020.

52.     Other nurse practitioners have shared with Dr. Ollivant that they, like him, believe that Optum is pressuring them to minimize hospitalizations for patients who need to be sent to the ER, and that they were criticized by Optum/United for sending patients to the hospital when it was necessary to do so. Nurse practitioner Melanie Brinckerhoff was one.

## V. APPLICABLE LAW

### A. MEDICARE ADVANTAGE PROGRAMS

53.     The Medicare Act, 42 U.S.C. § 1395 *et seq*., establishes a federal health insurance program for disabled and elderly individuals. Parts A and B of the Act create the traditional, commonly-known Medicare program. Part D provides coverage for prescription drugs.  Under this program, the Center for Medicare and Medicaid Services ("CMS") within the Department of Health and Human Services pays for medical care that eligible individuals receive from participating providers—e.g., doctors, hospitals, and medical groups. The government sets rates for the care and reimburses providers for each service provided. Accordingly, this program is often called Medicare "fee-for-service."

54.     Part C of the Act creates the Medicare Advantage program. This program allows eligible individuals to receive healthcare benefits through private insurance plans instead of through traditional Medicare. *See id*. § 1395w-21 *et seq*.   Medicare Advantage seeks to improve

20

the quality of care while safeguarding the public fisc by employing a "capitation" payment system. Capitation means an amount is paid per person. Capitation, Black's Law Dictionary (10th ed. 2014). Under Medicare Advantage's capitation system, private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage. These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs. *See* Patricia A. Davis et al., Cong. Research Serv., R40425, Medicare Primer 20 (2017), https://fas.org/sgp/crs/misc/R40425.pdf.  However, a Medicare Advantage plan must provide "at a minimum . . . all items and services (other than hospice care or coverage for organ acquisitions for kidney transplants) for which benefits are available under parts A and B of Medicare."  42 C.F.R. § 422.100(c)(1); *see also* 42 C.F.R. § 422.101.

55.    CMS calculates the payment for each enrollee based on various "risk adjustment data," such as an enrollee's demographic profile and the enrollee's health status, as reflected in the medical diagnosis codes associated with healthcare the enrollee receives. These diagnosis codes (also known as encounter data) are reported by Medicare Advantage organizations to CMS. Because Medicare Advantage organizations have a financial incentive to exaggerate an enrollee's health risks by reporting diagnosis codes that may not be supported by the enrollee's medical records, Medicare regulations require a Medicare Advantage organization, as an express condition of receiving payment, to "certify (based on best knowledge, information, and belief) that the [risk adjustment] data it submits ... are accurate, complete, and truthful." 42 C.F.R. § 422.504(l), (l)(2).

56.    As the Ninth Circuit has recently explained,

By design, Medicare Advantage is supposed to compensate [] organizations [like Optum/United] for expected healthcare costs, paying "less for healthier enrollees and more for less healthy enrollees." Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4657 (Jan. 28, 2005). So capitation rates are based largely on an individual's "risk adjustment data," which reflect several factors that can affect healthcare costs. *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i); 42 C.F.R. § 422.308(c). Chief among these data are individuals' medical diagnoses. *See* Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54,634, 54,673 (Oct. 22, 2009).

*United States ex rel. Anita Silingo v. WellPoint, Inc*., 904 F.3d 667, 672 (9th Cir. 2018).

57.    In other words, the capitated rates paid by CMS to Optum/United are based on –

and anticipate – the services likely to be required by a given patient given his or her health status,

including emergency services and hospitalizations. Indeed, CMS pays the highest capitated rates

for ISNP enrollees precisely because they are the most vulnerable Medicare patients. Medicare

Part C defines the "special needs individuals" who comprise ISPNs to include persons

(iii) . . . with severe or disabling chronic conditions who--

(I) . . . have one or more comorbid and medically complex chronic conditions that are substantially disabling or life threatening, ***have a high risk of hospitalization or other significant adverse health outcomes***, and require specialized delivery systems across domains of care;

42 U.S.C.A. § 1395w-28 (emphasis added); *see also* 42 U.S.C.A. § 1395w-22(a)(3)(D)(iii)

(defining "chronically ill enrollee" similarly).

58.    A Medicare Advantage program "is required to '[a]dopt and implement an

effective compliance program, which must include measures that prevent, detect, and correct

non-compliance with CMS' program requirements,' such as written standards of conduct, the

designation of a compliance officer, and other listed minimum requirements." *WellPoint*, 904

F.3d at 673 (citing 42 C.F.R. § 422.503(b)(4)(vi)).

### B.  MEDICAID MANAGED CARE PROGRAMS

59.     Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program providing payment of medical expenses to low-income patients.  Funding for Medicaid is shared between the federal government and state governments and is derived from federal and state taxes.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage.

60.     In a Final Rule issued May 6, 2016, CMS sought to

> modernize[] the Medicaid managed care regulations to reflect changes in the usage of managed care delivery systems. The final rule aligns, where feasible, many of the rules governing Medicaid managed care with those of other major sources of coverage, including coverage through . . . Medicare Advantage plans; implements statutory provisions; strengthens actuarial soundness payment provisions to promote the accountability of Medicaid managed care program rates; and promotes the quality of care and strengthens efforts to reform delivery systems that serve Medicaid and CHIP beneficiaries. It also ensures appropriate beneficiary protections and enhances policies related to program integrity.

"Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability," 81 FR 27498 (HHS May 6, 2016) (Final Rule).

### C.  THE NURSING HOME REFORM ACT

61.     The Nursing Home Reform Act, Pub. L. No. 100-203, title IV, 101 Stat. 1330-160 *passim* (Dec. 22, 1987) (codified as amended at 42 U.S.C. § 1395i-3), was passed specifically in an attempt to protect the rights of nursing home residents and create a set of uniform standards for elder care. It sets forth certain requirements for the provision of services by a SNF including that the SNF "must care for its residents in such a manner and in such an environment as will

23

promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1395i-

3(b)(1)(A). Another provision states that an SNF

> must provide services to attain or maintain the highest practicable physical,
> mental, and psychosocial well-being of each resident, in accordance with a
> written plan of care . . . .

42 U.S.C. § 1395i-3(b)(2). Subsection (b)(4) states:

> Provision of services and activities
>
> (A) . . . To the extent needed to fulfill all plans of care described in paragraph (2),
> a skilled nursing facility must provide, directly or under arrangements (or, with
> respect to dental services, under agreements) with others for the provision of—
>
> (i) nursing services and specialized rehabilitative services to attain or maintain the
> highest practicable physical, mental, and psychosocial well-being of each
> resident;
>
> (ii) medically-related social services to attain or maintain the highest practicable
> physical, mental, and psychosocial well-being of each resident;
>
> (iii) pharmaceutical services (including procedures that assure the accurate
> acquiring, receiving, dispensing, and administering of all drugs and biologicals) to
> meet the needs of each resident;
>
> (iv) dietary services that assure that the meals meet the daily nutritional and
> special dietary needs of each resident;
>
> (v) an on-going program, directed by a qualified professional, of activities
> designed to meet the interests and the physical, mental, and psychosocial well-
> being of each resident;
>
> (vi) routine and emergency dental services to meet the needs of each resident; and
>
> (vii) treatment and services required by mentally ill and mentally retarded
> residents not otherwise provided or arranged for (or required to be provided or
> arranged for) by the State.
>
> ***The services provided or arranged by the facility must meet professional
> standards of quality***. . . .

*Id.* at § 1395i-3(b)(4) (emphasis added).

### D. THE FALSE CLAIMS ACT

62.     The Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), provides that any person who (1) knowingly presents or causes another to present a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty of not less than $10,781 and not more than $21,563 for each such claim, plus three times the amount of the damages sustained by the government. *see id.* at §§ 3729(a)(1)(A) & (a)(1)(B), 28 C.F.R. § 85.3. Significantly, "[l]iability attaches upon proof that a false claim for payment was made, regardless of whether the government suffered actual damage." *WellPoint, Inc.*, 904 F.3d at 674 (citing *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002)). In particular, "[t]he Medicare Advantage capitation payment system is subject to the False Claims Act." *WellPoint*, 904 F.3d at 673.

63.     The State Plaintiffs have also enacted False Claims Act statutes that apply to Medicaid fraud.

#### 1. Materiality of Optum/United's Deficient Medical Services

64.     The failure to comport with Medicare- and/or Medicaid-required standards of care in delivering services to patients in a SNF violates of the FCA if compliance with the particular standard in question is material to the government's decision to pay the claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).

65.     A case similar to this one is instructive. *United States ex rel. Scharber v. Golden Gate National Senior Care LLC*, 135 F. Supp. 3d 944 (D. Minn. 2015), involved Twin Rivers, an SNF operated by its parent company, Golden Gate National Senior Care LLC ("Golden Gate"). The relators alleged that Golden Gate engaged in fraud through, among others, the following

practices: (1) insufficient staffing to provide the required standard of care for all of the nursing home residents; (2) insufficient budgets to meet residents' needs; (3) using budget reductions to punish the nursing homes when staff reported certain patient problems such as pressure sores; (4) failure to prevent harm or placing residents at greater risk of harm.

66.    The defendants moved to dismiss under Rule 12(b)(6) arguing that the complaint, at most, charged them with regulatory violations that constituted mere "conditions of participation," rather than "conditions of payment" such that their claims for reimbursement by Medicare or Medicaid violated the FCA. Specifically, the defendants asserted that their alleged conduct may have violated the NHRA, but that did not translate into a violation of the FCA.

67.    The court upheld relator's theory that substandard care might render the claims to be false within the meaning of the FCA. The court explained:

> The defendants use the terms "conditions of payment" and "conditions of participation" to draw an unnecessarily sharp line between different types of problematic behavior. Whatever label the defendants wish to apply to the conduct at issue, the relators have properly alleged an FCA violation if they have described deficient conduct that would have been material to the government's decision to provide payment. See *United States v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006) (labeling the condition of participation versus condition of payment distinction nothing more than "a distinction without a difference") . . . .

*Id*. at 962. The key question, according to the court, "is whether Twin Rivers' communication with the government, whether describing compliance with conditions of participation or not, falsely expressed a quality of care and service that, if the government had known the truth, would have led it to stop paying Twin Rivers." *Id*. at 963.  This ruling was effectively upheld in *Escobar*, where the Supreme Court explained, "Whether a [contractual, statutory, or regulatory] provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry."  136 S. Ct. at 2001.

68.     As one treatise notes, in a situation whereby Medicare and/or Medicaid

reimburses a SNF on a "per diem" basis – as is the case here – " '[b]y ordering fewer tests, using

fewer supplies, employing less staff and reducing referrals to specialists,' the nursing home

facility is providing inadequate services in order to increase its profits. These tactics violate the

Nursing Home Reform Act, the Social Security Act, and Medicare/Medicaid laws." Joel M.

Androphy, *Federal False Claims Act and Qui Tam Litigation* (Kindle Locations 6978-6980),

ALM Kindle Edition, quoting Munich and Lane, "When Neglect Becomes Fraud: Quality of

Care and False Claims," 43 St. Louis U. L.J. 27, 30–31 (1999).

69.     Androphy's treatise cites *United States v. NHC Healthcare Corp.*, 115 F. Supp.

2d 1149, 1151, 1152–53 (W.D. Mo. 2000), in which the court upheld the legal sufficiency of the

government's FCA theory for inadequate care by an SNF. The government alleged "[d]efendant

had such woefully low staff numbers at its facility that it could not possibly have rendered all the

care that it billed the Medicare and Medicaid programs." The Government cited two patients

who

> developed pressure sores, incurred unusual weight loss, were in unnecessary
> pain, were generally not given care up to the standards required under the
> Medicare and Medicaid programs, and ultimately died because of this care. The
> Government claims that these two residents were given this inadequate care
> because the Defendant knowingly maintained inadequate staffing at its facility.
> The Government further claims that because the Defendant knew of these staff
> shortages and knew that it was not providing the necessary care to these two
> patients it was submitting false and fraudulent claims to the Medicare and
> Medicaid programs.

115 F. Supp. 2d at 1150.

70.     The court grappled with how to apply the FCA where the provider was not

compensated by Medicare and Medicaid on a fee-for-service basis. The court acknowledged that

in such a case it would be straightforward to ascertain whether each such service had been

delivered, and, if it had not, the claim for it would be false. *Id.* at 1153. The court explained that the case before it involved "per diem" payments. The court observed:

> Medicaid and Medicare pay the Defendant a "per diem" payment for caring for each of the residents in the programs. This per diem payment is meant to cover the expenses of all necessary treatment given to each patient. In exchange for this per diem payment the care facility agrees in principle to "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life." 42 U.S.C. § 1396r(b) (quotation from Nursing Home Reform Act which all Medicare and Medicaid recipients are required to adhere to). Therefore, the Court holds that in order for the Plaintiff to prove that it was fraudulently billed for the care given to the two residents at issue in this lawsuit it must demonstrate that the patients were not provided the quality of care which promotes the maintenance and the enhancement of the quality of life.

71.    The rendering of hospital emergency services in cases of life threatening medical crises surely must be part of a quality of care required to "promote the maintenance and the enhancement" of life for SNF patients of Optum/United.  Not only did they fail to provide such emergency care, and thereby breach a condition of participation in the Government SNF program, but "baked in" incentives to discourage the delivery of the emergency care.

72.    In *United States ex rel. Aranda v. Community Psychiatric Ctrs.*, 945 F. Supp. 1485 (W.D. Okla. 1996), the Government sued Community Psychiatric Centers (CPC) for false claims. It "accuse[d] CPC of 'knowingly failing to provide the government insured patients with a reasonably safe environment.'" For example, the defendant failed to prevent patient-on-patient assaults.

73.    The court explained that the government's FCA theory applied to such circumstances, because (1) CPC submitted bills to the federal government for in-patient psychiatric care of Medicaid patients, (2) by submitting the bills, CPC 'implicitly certified that it was abiding by applicable statutes, rules and regulations' requiring provision to patients of

'appropriate quality of care and a safe and secure environment', and (3) CPC 'knew that it was not providing to its patients appropriate quality of care and a safe and secure environment'."

74.    The *Aranda* court specifically noted that the delivery of substandard care allows CMS to exclude a provider from the Medicare and Medicaid programs. "Statutes and regulations governing the Medicaid program clearly require health care providers to meet quality of care standards, and a provider's failure to meet such standards is a ground for exclusion from the program. See 42 U.S.C. § 1320a-7(b)(6)(B) (the Secretary may exclude anyone who furnishes patient services "of a quality which fails to meet professionally recognized standards of health care"); id. § 1320c-5 (providers must assure that patient services "will be of a quality which meets professionally recognized standards of health care")." 945 F. Supp. at 1488. These regulations establish conditions of payment in so far as CMS would deny payment if it had been informed of Optum/United's refusal to render timely emergency medical services in medical emergencies threatening the lives of its patients.

### 2.  **Worthless Services**

75.    Moreover, demands for payment constitute false claims if the services provided are worthless or so grossly deficient as to be virtually worthless.  *See, e.g.*, *Scharber*, 135 F. Supp. 3d at 964 ("Given the underlying purpose of the FCA to protect the federal fisc, it makes good sense that the statute would protect the government from paying for significantly deficient, even if not entirely non-existent, services."); *United States ex rel. Academy Health Ctr. v. Hyperion Found., Inc.*, No. 10-552, 2014 U.S. Dist. LEXIS 93185, 2014 WL 3385189, at *42-*43 (S.D. Miss. 2014) ("[C]ourts have recognized that worthless services claims under the FCA are not, as a legal matter, limited to instances where no services at all are provided. A service can

be worthless because of its deficient nature even if the service was provided.").  The court in

*Academy Health* explained,

> As the Government has indicated compellingly, taken to its extreme, defendants'
> argument is that a nursing home is entitled to payment for doing nothing more
> than housing an elderly person and providing her with just enough bread and
> water for short-term survival, even in conditions of filth, mold and insect
> infestation; and even if it consistently provides her too little medication, or too
> much, or the wrong medication, contrary to her physician's orders; and even if it
> allows her to develop horrific pressure ulcers infected by feces and urine to the
> point that amputations are required; and even if it permits her to suffers falls and
> fractures; and even it allows her to asphyxiate on her own fluids due to inadequate
> resources to properly attend to her worsening condition. This cannot be the case
> and it is not the law.

2014 WL 3385189, at *44.

76.    Here, as the example of patients MT, SK, and LG all demonstrate,

Optum/United's aggressive refusal/reluctance to provide their patients with necessary hospital

treatment in the name of making higher profits posed life-threatening risks to the patients, and

sometimes resulted in permanent damage to their health. We believe the facts therefore support

the conclusion that the services were virtually, if not actually, worthless.

### 3.  Violations of the Anti-Kickback Statute

77.    In addition, Optum/United's payments to other area providers to induce referrals

constitute illegal kickbacks in violation of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b)

(the "AKS").  Violations of the AKS, in turn, violate the False Claims Act.  In 2010, the Patient

Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g),

amended the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), to specifically allow violations of

its "anti-kickback" provisions to be enforced under the False Claims Act, discussed next.  The

PPACA also amended the statute's "intent requirement" to make clear that violations of the anti-

kickback provisions, like violations of the False Claims Act, may occur even if an individual

does "not have actual knowledge" or "specific intent to commit a violation."  *Id*. at Sec. 6402(h).

## VI.        GLOSSARY OF ACRONYMS AND TERMS

78.    Below is a glossary of acronyms and terms relevant to this action.

| | |
|---|---|
| ALF | Adult Living Facility |
| APC | Advanced Practice Clinician, i.e., an NP or PA |
| APK | Admissions to hospital per thousand patients. |
| Bypass | An SNF's failure to contact Optum before sending a patient to the hospital. |
| CA | Clinical Advisor – a team lead; usually a strong clinician |
| CIC | Change in Condition; *i.e.*, change in patient's condition |
| CSM | Clinical Service Manager – Like Fang Fang, a manager of a team of Optum NPs and Pas |
| DNR | Do not Resuscitate (orders to not apply CPR or intubation, but patient may still want hospital care) |
| DNR Comfort | Patient does not want to be transferred to hospital for illness |
| Full/EMS | Patient wants Full code and Emergency Medical Services |
| ISNP | Institutional Special Needs Plan. |
| IVF | Intravenous Fluids |
| MD | Optum regional medical director |
| MRA | Mortality Risk Assessment – tool devised by Optum; not validated |
| NP | Nurse practitioner; they operate independently in Washington state but do not have hospital admitting privileges |
| PA | Physician Assistant |
| PCP | Primary Care Physician paid by Optum to make rounds ay SNFs; patients are assigned to PCP – they do not choose their own PCP |
| Playbook | The ISNP Playbook – Optum's procedure manual for ISNP |

| POA | Power of Attorney – the person with decisionmaking authority for patient |
|---|---|
| POC | Plan of Care |
| PPI | Proton Pump Inhibitor, an acid reduction therapy |
| SIC | Serious Illness Conversation – to plan actions for contingencies of patient's condition (unstated goal is to change from Full/EMS to DNR, DNR Comfort, palliative care and/or hospice). |
| SNF | Skilled Nursing Facility |

## VII.    COUNTS

### COUNT 1.  VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *ET SEQ.*

79.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

80.    This is a claim for treble damages and civil penalties under the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

81.    By virtue of the deficient care Defendants provided Medicare patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the federal government false or fraudulent claims for payment or approval.

82.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

83.    The federal government, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

84.     By reason of these payments, the federal government has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 2.   VIOLATION OF THE ALASKA MEDICAL ASSISTANCE FALSE CLAIM AND REPORTING ACT, AK STAT. § 09.58 ET SEQ.

85.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

86.     This is a claim for treble damages and civil penalties under the Alaska Medical Assistance False Claim and Reporting Act, AK Stat. § 09.58 *et seq.*

87.     By virtue of the deficient care Defendants provided Alaska Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Alaska Medicaid Program false or fraudulent claims for payment or approval.

88.     Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Alaska Medical Assistance False Claim and Reporting Act.

89.     The Alaska Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

90.     By reason of these payments, the Alaska Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 3.   VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE §§ 12650 ET SEQ.

91.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

92.     This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq*.

93.     By virtue of the deficient care Defendants provided California Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to MediCal, the California Medicaid program, false or fraudulent claims for payment or approval.

94.     Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the California False Claims Act.

95.     MediCal, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

96.     By reason of these payments, MediCal has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 4.   VIOLATION OF THE COLORADO MEDICAID FALSE CLAIMS ACT, COLO. REV. STAT. §§ 25.5-4-303.5, *ET SEQ.*

97.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*.

99.     By virtue of the deficient care Defendants provided Colorado Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval.

100.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Colorado Medicaid False Claims Act.

101.    The Colorado Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

102.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT 5.   VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT,
C.G.S. § 4-274 *ET SEQ.***

103.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

104.    This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, C.G.S. § 4-274 *et seq.*

105.    By virtue of the deficient care Defendants provided Connecticut Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval.

106.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Connecticut False Claims Act.

107.    The Connecticut Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

108.    By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 6.   VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT, 6 DEL. CODE §§ 1201 *ET SEQ.*

109.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

110.    This is a claim for treble damages and civil penalties under the Delaware False Claims And Reporting Act, 6 Del. Code §§ 1201 *et seq*.

111.    By virtue of the deficient care Defendants provided Delaware Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for payment or approval.

112.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Delaware False Claims And Reporting Act.

113.    The Delaware Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

114.    By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 7.   VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C. CODE §§ 2-381.02 *ET SEQ.*

115.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

116.    This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code §§ 2-381.02 *et seq*.

117.    By virtue of the deficient care Defendants provided D.C. Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval.

118.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the District of Columbia False Claims Act.

119.    The District of Columbia Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

120.    By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 8.    VIOLATION OF THE FLORIDA FALSE CLAIMS ACT, FLA. STAT. ANN. §§ 68.081 *ET SEQ.*

121.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq*.

123.    By virtue of the deficient care Defendants provided Florida Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval.

37

124.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Florida False Claims Act.

125.    The Florida Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

126.    By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT 9.   VIOLATION OF THE GEORGIA FALSE MEDICAID CLAIMS ACT, GA. CODE ANN. §§ 49-4-168 *ET SEQ.***

127.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

128.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq*.

129.    By virtue of the deficient care Defendants provided Georgia Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval.

130.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

131.    The Georgia Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

132.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 10.  VIOLATION OF THE HAWAII FALSE CLAIMS ACT, HAW. REV. STAT. §§ 661-21 *ET SEQ.*

133.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

134.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*

135.    By virtue of the deficient care Defendants provided Hawaii Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval.

136.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Hawaii False Claims Act.

137.    The Hawaii Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

138.    By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 11.  VIOLATION OF THE ILLINOIS FALSE CLAIMS ACT, 740 ILL. COMP. STAT. 175/1 *ET SEQ.*

139.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

140.    This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*

141.    By virtue of the deficient care Defendants provided Illinois Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval.

142.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Illinois False Claims Act.

143.    The Illinois Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

144.    By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 12.  VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, BURNS IND. CODE §§ 5-11-5.5-1 *ET SEQ.*

145.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

146.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. §§ 5-11-5.5-1 *et seq.*

147.    By virtue of the deficient care Defendants provided Indiana Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly

presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval.

148.     Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

149.     The Indiana Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

150.     By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 13.  VIOLATION OF THE IOWA FALSE CLAIMS LAW, IOWA CODE §§ 685.1 *ET SEQ.*

151.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

152.     This is a claim for treble damages and civil penalties under the Iowa False Claims Law, Iowa Code §§ 685.1 *et seq.*

153.     By virtue of the deficient care Defendants provided Iowa Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval.

154.     Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Iowa False Claims Law.

155.    The Iowa Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

156.    By reason of these payments, the Iowa Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 14.  VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW, LA. REV. STAT. §§ 46:437.1 *ET SEQ.*

157.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

158.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437.1 *et seq*.

159.    By virtue of the deficient care Defendants provided Louisiana Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval.

160.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law.

161.    The Louisiana Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

162.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 15.  VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT, MD. HEALTH CODE ANN. §§ 2-601 *ET SEQ.*

163.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

164.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Health Code Ann. §§ 2-601 *et seq.*

165.    By virtue of the deficient care Defendants provided Maryland Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval.

166.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Maryland False Health Claims Act.

167.    The Maryland Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

168.    By reason of these payments, the Maryland Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 16.  VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS LAW, MASS. ANN. LAWS CH. 12, § 5A-5O

169.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

170.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Law, Mass. Ann. Laws Ch. 12, § 5A-5O.

171.    By virtue of the deficient care Defendants provided Massachusetts Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval.

172.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Massachusetts False Claims Law.

173.    The Massachusetts Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

174.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 17.  VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIM ACT, M.C.L.A. §§ 400.601 *ET SEQ.*

175.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

176.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claim Act, M.C.L.A. §§ 400.601 *et seq.*

177.    By virtue of the deficient care Defendants provided Michigan Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval.

178.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Michigan Medicaid False Claim Act.

179.    The Michigan Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

180.    By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 18.  VIOLATION OF THE MINNESOTA FRAUDULENT STATE CLAIMS ACT, MINN. STAT. §§ 15C.01 *ET SEQ.*

181.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

182.    This is a claim for treble damages and civil penalties under the Minnesota Fraudulent State Claims Act, Minn. Stat. §§ 15C.01 *et seq.*

183.    By virtue of the deficient care Defendants provided Minnesota Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval.

184.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Minnesota Fraudulent State Claims Act.

185.    The Minnesota Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

45

186.     By reason of these payments, the Minnesota Medicaid Program has been

damaged, and continues to be damaged, in a substantial amount.

### COUNT 19.  VIOLATION OF THE MONTANA FALSE CLAIMS ACT, MONT. CODE ANN. §§ 17-8-401 *ET SEQ.*

187.     Relator re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

188.     This is a claim for treble damages and civil penalties under the Montana False

Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*

189.     By virtue of the deficient care Defendants provided Montana Medicaid patients

and the resulting submissions of non-reimbursable claims described above, Defendants

knowingly presented or caused to be presented to the Montana Medicaid Program false or

fraudulent claims for payment or approval.

190.     Moreover by virtue of the deficient care and submissions of non-reimbursable

claims described above, Defendants conspired to commit violations of the Montana False Claims

Act.

191.     The Montana Medicaid Program, unaware of the false or fraudulent nature of the

claims Defendants caused to be submitted, paid for claims that otherwise would not have been

allowed.

192.     By reason of these payments, the Montana Medicaid Program has been damaged,

and continues to be damaged, in a substantial amount.

### COUNT 20.  VIOLATION OF THE NEVADA FALSE CLAIMS ACT, NEV. REV. STAT. §§ 357.010 *ET SEQ.*

193.     Relator re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

194.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq*.

195.    By virtue of the deficient care Defendants provided Nevada Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval.

196.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Nevada False Claims Act.

197.    The Nevada Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

198.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 21.  VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. §§ 2A:32C-1 *ET SEQ.*

199.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

200.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq*.

201.    By virtue of the deficient care Defendants provided New Jersey Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval.

47

202.     Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Jersey False Claims Act

203.     The New Jersey Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

204.     By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 22.  VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. ANN. 1978, §§ 27-14-1 *ET SEQ.*

205.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

206.     This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978, §§ 27-14-1 *et seq*.

207.     By virtue of the deficient care Defendants provided New Mexico Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval.

208.     Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Mexico Medicaid False Claims Act.

209.     The New Mexico Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

210.    By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 23.  VIOLATION OF THE NEW YORK FALSE CLAIMS ACT, N.Y. STATE FIN. LAW §§ 187 *ET SEQ.*

211.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

212.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law §§ 187 *et seq.*

213.    By virtue of the deficient care Defendants provided New York Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval.

214.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New York False Claims Act.

215.    The New York Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

216.    By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 24.  VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT, 52 N.C. GEN. STAT. §§ 1-605 *ET SEQ.*

217.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

49

218.    This is a claim for treble damages and civil penalties under the North Carolina
False Claims Act, 52 N.C. Gen. Stat. §§ 1-605 *et seq*.

219.    By virtue of the deficient care Defendants provided North Carolina Medicaid
patients and the resulting submissions of non-reimbursable claims described above, Defendants
knowingly presented or caused to be presented to the North Carolina Medicaid Program false or
fraudulent claims for payment or approval.

220.    Moreover by virtue of the deficient care and submissions of non-reimbursable
claims described above, Defendants conspired to commit violations of the North Carolina False
Claims Act.

221.    The North Carolina Medicaid Program, unaware of the false or fraudulent nature
of the claims Defendants caused to be submitted, paid for claims that otherwise would not have
been allowed.

222.    By reason of these payments, the North Carolina Medicaid Program has been
damaged, and continues to be damaged, in a substantial amount.

**COUNT 25.  VIOLATION OF THE OKLAHOMA MEDICAID FALSE
CLAIMS ACT, 63 OKL. ST. §§ 5053 *ET SEQ*.**

223.    Relator re-alleges and incorporates by reference the allegations contained in the
preceding paragraphs of this Complaint.

224.    This is a claim for treble damages and civil penalties under the Oklahoma
Medicaid False Claims Act, 63 Okl. St. §§ 5053 *et seq*.

225.    By virtue of the deficient care Defendants provided Oklahoma Medicaid patients
and the resulting submissions of non-reimbursable claims described above, Defendants
knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or
fraudulent claims for payment or approval.

226.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Oklahoma Medicaid False Claims Act.

227.    The Oklahoma Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

228.    By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 26.  VIOLATION OF THE RHODE ISLAND STATE FALSE CLAIMS ACT, R.I. GEN. LAWS 1956, §§ 9-1.1-1 *ET SEQ.*

229.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

230.    This is a claim for treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Laws 1956, §§ 9-1.1-1 *et seq*.

231.    By virtue of the deficient care Defendants provided Rhode Island Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval.

232.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Rhode Island State False Claims Act.

233.    The Rhode Island Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

234.    By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT 27.  VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE ANN. §§ 71-5-181 *ET SEQ.***

235.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

236.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq*.

237.    By virtue of the deficient care Defendants provided Tennessee Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval.

238.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Tennessee Medicaid False Claims Act.

239.    The Tennessee Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

240.    By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT 28.  VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE ANN. § 36.001 *ET SEQ.***

241.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

52

242.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

243.    By virtue of the deficient care Defendants provided Texas Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval.

244.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

245.    The Texas Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

246.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 29.  VIOLATION OF THE VERMONT FALSE CLAIMS ACT, 32 V.S.A. § 632 *ET SEQ.*

247.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

248.    This is a claim for treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. § 632 *et seq*.

249.    By virtue of the deficient care Defendants provided Vermont Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Vermont Medicaid Program false or fraudulent claims for payment or approval.

250.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Vermont False Claims Act.

251.    The Vermont Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

252.    By reason of these payments, the Vermont Medicaid Program has been damaged, and continues to be damaged, in a substantial amount

### COUNT 30.  VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. §§ 8.01-216.1 *ET SEQ.*

253.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

254.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

255.    By virtue of the deficient care Defendants provided Virginia Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval.

256.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Virginia Fraud Against Taxpayers Act.

257.    The Virginia Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

258.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT 31.  VIOLATION OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT, REV. CODE WASH. §§ 74.66.005 *ET SEQ.*

259.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

260.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. §§ 74.66.005 *et seq.*

261.    By virtue of the deficient care Defendants provided Washington Medicaid patients and the resulting submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval.

262.    Moreover by virtue of the deficient care and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Washington Medicaid Fraud False Claims Act.

263.    The Washington Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

264.    By reason of these payments, the Washington Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against Defendant, ordering that:

a.      Defendant cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, the State and Municipal False Claims Acts, and the California Insurance Frauds Prevention Act;

b.      Defendant pay not less than $10,781 and not more than $21,563[7] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendant's actions, plus the appropriate amount to the States and Municipalities under similar provisions of their False Claims Acts;

c.      Defendant pay not less than $5,000 and not more than $10,000 for each and every fraudulent claim for compensation Defendant caused to be submitted in violation of the California Insurance Frauds Prevention Act, plus an assessment not more than three times the amount of each claim;

d.      The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State and Municipal False Claims Acts and the California Insurance Frauds Prevention Act;

e.      The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts and the California Insurance Frauds Prevention Act;

f.      Defendant be enjoined from concealing, removing, encumbering or disposing of assets that may be required to pay the damages and civil monetary penalties imposed by the Court;

---

[7] As adjusted in accordance with the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 84 FR 13520 (DOJ 2019) (available at https://www.govinfo.gov/content/pkg/FR-2019-04-05/pdf/FR-2019-04-05.pdf) (making final civil penalties set in interim final rule in 2016, *see* 81 FR 42491 (DOJ 2016)).

g.      Defendant disgorge all sums by which it has been enriched unjustly by its

wrongful conduct; and

h.      The United States, the States, Municipality, and the Relator recover such

other relief as the Court deems just and proper.

### REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the State of Washington and

Relator hereby demand a trial by jury.

Dated:  May 12, 2020

Respectfully submitted,

Douglas C. McDermott, WSBA #31500
dmcdermott@pt-law.com
PAUKERT & TROPPMANN, PLLC
522 West Riverside Avenue, Suite 560
Spokane, Washington 99201
Telephone: 509-203-7088
Facsimile: 509-232-7762

John A. Kolar (*pro hac vice* pending)
Director of Litigation
GOVERNMENT ACCOUNTABILITY
PROJECT
1612 K Street, N.W.
Suite 1100
Washington, D.C. 20006
(202) 457-0034 Ext. 197
Jackk@whistleblower.org

Reuben A. Guttman (*pro hac vice* pending)
Traci L. Buschner (*pro hac vice* pending)
Elizabeth H. Shofner (*pro hac vice* pending)
GUTTMAN, BUSCHNER & BROOKS
PLLC
2000 P Street, N.W., Suite 300

Washington, DC 20036
Tel.: (202) 800-3001
Fax: (202) 827-0041

Justin S. Brooks (*pro hac vice* pending)
GUTTMAN, BUSCHNER & BROOKS
PLLC
119 Coulter Avenue
Suite 211
Ardmore, PA 19003
Tel.: (202) 800-3001
Fax: (202) 827-0041

(Attorneys for Plaintiff-Relator Maxwell
Ollivant)

## CERTIFICATE OF SERVICE

I hereby certify that a file-stamped copy of this Complaint will served upon the following persons as soon as practicable via Certified Mail, return receipt requested.


/s/Aaron M. Verosky
Aaron M. Verosky


VIA CERTIFIED MAIL

RETURN RECEIPT REQUESTED


| United States | U.S. Attorney General William Barr<br>United States Department of Justice<br>950 Pennsylvania Ave, NW<br>Washington, DC 20530<br><br>Mr. Andy Mao<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>United States Department of Justice<br>175 N. Street, NE<br>Washington, DC 20002<br><br>U.S Attorney William D. Hyslop<br>Attn: Daniel Fruchter, AUSA<br>Eastern District of Washington<br>920 W Riverside Ave, Suite 340<br>Spokane, WA 99201<br><br>Honorable Brian T. Moran<br>United States Attorney<br>Western District of Washington<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271 |
| --- | --- |
| Alaska | Attorney General Kevin G. Clarkson<br>Alaska Department of Law<br>1031 W. 4th Avenue, Suite 200<br>Anchorage, AK 99501 |

| California | Attorney General Xavier Becerra<br>Office of the Attorney General<br>1300 "I" Street, Suite 1740<br>Sacramento, CA 95814<br><br>Ricardo Lara, Insurance Commissioner<br>California Department of Insurance<br>Government Law Bureau<br>300 Capitol Mall, Suite 1700<br>Sacramento, CA 95814 |
|---|---|
| Colorado | Attorney General Phil Weiser<br>Office of the Attorney General<br>Ralph L. Carr Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 |
| Connecticut | Attorney General William Tong<br>Office of the Attorney General<br>55 Elm Street<br>Hartford, CT 06106-1774 |
| Delaware | Attorney General Kathy Jennings<br>Office of the Attorney General<br>Carvel State Office Building<br>820 North French Street<br>Wilmington, DE 19801 |
| District of Columbia | Attorney General Karl Racine<br>Office of the Attorney General<br>441 4th Street, NW<br>Suite 1100S<br>Washington, DC 20001 |
| Georgia | Attorney General Chris Carr<br>Office of the Attorney General<br>40 Capitol Square, SW<br>Atlanta, GA 30334-1300 |
| Florida | Attorney General Ashley Moody<br>Office of the Attorney General<br>The Capitol PL-01<br>Tallahassee, FL 32399<br><br>Jimmy Patronis, CFO<br>Division of Legal Services<br>Florida Department of Financial Services<br>200 East Gaines Street<br>Tallahassee, FL 32399 |

| Hawaii | Attorney General Clare Connors<br>Department of the Attorney General<br>425 Queen Street<br>Honolulu, HI 96813 |
|---|---|
| Iowa | Attorney General Tom Miller<br>Office of the Attorney General<br>Hoover State Office Bldg.<br>1305 East Walnut Street<br>Des Moines, IA 50319 |
| Illinois | Attorney General Kwame Raoul<br>Office of the Attorney General<br>100 West Randolph Street<br>Chicago, IL 60601<br><br>Ed Siskel, Corporation Counsel<br>City of Chicago, Law Department<br>121 North LaSalle Street, Room 600<br>Chicago, IL  60602<br><br>Anna M. Valencia, City Clerk<br>City of Chicago<br>121 North LaSalle Street, Room 107<br>Chicago, IL  60602 |
| Indiana | Attorney General Curtis Hill<br>Office of the Attorney General<br>Indiana Government Center South<br>302 W. Washington Street, 5th Floor<br>Indianapolis, IN 46204<br><br>Lori Torres, Inspector General<br>Office of the Inspector General<br>315 West Ohio Street, Room 104<br>Indianapolis, IN 46202 |
| Louisiana | Attorney General Jeff Landry<br>Office of the Attorney General<br>1885 N. Third Street<br>Baton Rouge, LA 70804 |
| Maryland | Attorney General Brian E. Frosh<br>Office of the Attorney General<br>200 St. Paul Place<br>Baltimore, MD 21202-2202 |
| Massachusetts | Attorney General Maura Healey<br>Office of the Attorney General |

| | 1 Ashburton Place<br>Boston, MA 02108 |
|---|---|
| **Michigan** | Attorney General Dana Nessel<br>Office of the Attorney General<br>525 W. Ottawa Street<br>P.O. Box 30212<br>Lansing, MI 48909 |
| **Minnesota** | Attorney General Keith Ellison<br>Office of the Attorney General<br>445 Minnesota Street, Suite 1400<br>St. Paul, MN 55101 |
| **Montana** | Attorney General Tim Fox<br>Office of the Attorney General<br>215 N. Sanders Street<br>Helena, MT 59601 |
| **Nevada** | Attorney General Aaron Ford<br>Office of the Attorney General<br>100 North Carson Street<br>Carson City, NV 89701 |
| **New Jersey** | Attorney General Gurbir Grewal<br>Office of the Attorney General<br>RJ Hughes Justice Complex<br>25 Market Street, P.O. Box 080<br>Trenton, NJ 08625-0080 |
| **New Mexico** | Attorney General Hector H. Balderas<br>408 Galisteo Street, Villagra Building<br>P.O. Box 1508<br>Santa Fe, NM  87504-1508<br><br>Dr. David Scrase<br>Office of the Secretary<br>Human Services Department<br>P.O. Box 2348<br>Santa Fe, NM 87504-2348 |
| **New York** | Attorney General Letitia James<br>Office of the Attorney General<br>The Capitol<br>Albany, NY 12224-0341 |
| **North Carolina** | Attorney General Josh Stein<br>Office of the Attorney General<br>9001 Mail Service Center<br>Raleigh, NC  27699-9001 |

| Oklahoma | Attorney General Mike Hunter<br>Office of the Attorney General<br>Attn: Medicaid Fraud Control Unit<br>313 NE 21st Street<br>Oklahoma City, OK 73105 |
|---|---|
| Rhode Island | Attorney General Peter Neronha<br>Office of the Attorney General<br>150 South Main Street<br>Providence, RI  02903 |
| Tennessee | Attorney General Herbert H. Slattery, III<br>Office of the Attorney General & Reporter<br>P.O. Box 20207<br>Nashville, TN 37202 |
| Texas | Attorney General Ken Paxton<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, TX 78711 |
| Vermont | Attorney General T.J. Donovan<br>Office of the Attorney General<br>109 State Street<br>Montpelier, VT 05609 |
| Virginia | Attorney General Mark Herring<br>Office of the Attorney General<br>900 East Main Street<br>Richmond, VA 23219 |
| Washington | Attorney General Bob Ferguson<br>1125 Washington Street, SE<br>P.O. Box 40100<br>Olympia, WA 98504 |